950 So.2d 657 (2007)
Elizabeth W. NAQUIN, Individually and on Behalf of All Others Similarly Situated
v.
LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT, City of Lafayette, and Lafayette Public Utilities Authority.
No. 2006-C-2227.
Supreme Court of Louisiana.
February 22, 2007.
*658 Patrick S. Ottinger, City-Parish Attorney, Milling, Benson, Woodward, Baton Rouge, Michael D. Hebert, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, G. William Jarman, Gordon D. Polozola, for Applicant.
Pendley, Baudin & Coffin, Patrick W. Pendley, Stan P. Baudin, Plaquemine, Pierce & Shows, Christopher D. Shows, Andre P. LaPlace, Baton Rouge, for Respondent.
Michael H. Rubin, James D. Seymour, Jr., for Louisiana Municipal Association, Amicus Curiae.
Harry T. Lemmon, For Fiber To The Home Counsel, Amicus Curiae.
CALOGERO, Chief Justice.
The issue presented in this case is whether the court of appeal properly enjoined the issuance of $125 million in municipal bonds to fund the construction and *659 implementation of a "Fiber-to-the-Home" ("FTTH") telecommunications system in the City of Lafayette. The court of appeal found that the ordinance authorizing issuance of the bonds violates the Local Government Fair Competition Act, La.Rev. Stat. 45:844.41-45:844.56. Following our review of the law and the record in this case, we find that the court of appeal improperly enjoined the issuance of the bonds. Thus, we reverse the court of appeal judgment and deny plaintiffs' request that issuance of the bonds be enjoined.
The dispute in this case is between resident taxpayers of the City of Lafayette, on one side, and the Lafayette City-Parish Government and Lafayette Public Utilities Authority (hereinafter referred to collectively as "Lafayette"), on the other. Lafayette wants to develop a broadband communications system to provide state-of-the-art telecommunication services, including internet, cable television and telephone, to Lafayette residents. In order to finance its proposed telecommunications system, Lafayette proposed and the voters approved a referendum to issue bonds, supported in part by a secondary or subordinate pledge of the revenues of the Lafayette Utilities System. Lafayette then adopted a 2005 bond ordinance to implement the bonds, which ordinance was successfully challenged by Bellsouth Telecommunications. In Bellsouth Telecommunications, Inc. v. City of Lafayette, 05-1478, 05-1505 (La.App. 3 Cir. 1/5/06), 919 So.2d 844, the court of appeal enjoined issuance of the bonds authorized by the 2005 bond ordinance. Lafayette then adopted the 2006 bond ordinance at issue herein, which was challenged by these plaintiffs, Lafayette taxpayers. Their primary stated concern was to enjoin the pledge of utility system revenues that are in part being sought by plaintiffs in a separate lawsuit because of alleged overcharges for utilities services.

BACKGROUND, FACTS, AND PROCEDURAL HISTORY
The advantages of broadband technology over traditional internet services provided by copper telephone wires have been described as follows:
Broadband or high-speed Internet access is provided by a series of technologies that give users the ability to send and receive data at volumes and speeds far greater than current Internet access over traditional telephones. In addition to offering speed, broadband access provides a continuous, "always on" connection (no need to dial-up) and a "two-way" capability, that is, the ability to both receive (download) and transmit (upload) data at high speeds. Broadband access, along with the content and service it might enable, has the potential to transform the Internet: both what it offers and how it is used. It is likely that many of the future applications that will best exploit the technological capabilities of broadband have yet to be developed.[1]
Broadband availability has emerged as an important priority in the United States in recent years, as demonstrated by actions of both the executive and legislative branches of the federal government. In fact, President Bush set a goal of universal broadband availability by 2007.[2] Executive interest in telecommunications however *660 predates the current administration, as demonstrated by the following quotation:
The Clinton Administration has developed a broad plan to interconnect industry, government, research, education, and each home with advanced telecommunications networks and information resources and technologies. Considered a key part of a larger vision to improve U.S. high technology, economic development, health care, and education, this is the National Information Infrastructure (NII). The NII may be viewed three ways: as a policy for national information infrastructure development; as federal programs to enhance and support this development; and a wide range of applications which demonstrate the tangible uses and benefits of the technologies. The policy has been articulated in a series of NII reports; the program is supported through major government R & D and grant efforts; the applications focus on a variety of applications in schools, libraries, hospitals, government, and businesses.[3]
Congress has also shown strong interest in telecommunications issues, as evidenced by the passage of the Telecommunications Act of 1996 to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."[4] The Act "provides a wide range of provisions which may affect who develops the information infrastructure of the 21st century."[5] Seen from a public policy perspective, the goals of the Telecommunications Act of 1996 "are to ensure that broadband deployment is timely and contributes to the nation's economic growth, that industry competes fairly, and that service is provided to all sectors and geographical locations of American society."[6] The Act is designed to "open[] up markets to competition by removing unnecessary regulatory barriers to entry."[7]
Working with the Federal Communications Commission (FCC), Congress "is seeking to ensure fair competition among the players so that broadband will be available and affordable in a timely manner to all Americans who want it."[8] By 2001, as a result of the actions taken at the federal level, many offices and businesses had broadband internet access, but "a remaining challenge [was] providing broadband over `the last mile' to consumers in their homes."[9] Rural and low-income communities continued to "lack full access to high-speed broadband internet service," a fact that has prompted Congress to examine "the scope and effect of federal broadband financial assistance programs (including universal service), and the impact of telecommunications regulation and new technologies *661 on broadband deployment."[10]
At the state level, the Louisiana Legislature in 2004 adopted the Fair Competition Act, La.Rev.Stat. 45:844.41 et seq., which allows local municipal governments to provide broadband internet services, subject to certain restrictions.[11] It is this Act that is at the heart of the legal dispute in this case. La.Rev.Stat. 45:844.42 sets forth seven "legislative findings and declarations of intent" underlying adoption of the Fair Competition Act, the first of which is "to ensure that cable television services and telecommunications and advanced services are provided through fair competition consistent with the federal Telecommunications Act of 1996, Pub.L. 104-104, in order to provide the widest possible diversity of information and news sources to the general public." Relative specifically to telecommunications services provided by local governments, La.Rev.Stat. 45:844.42 lists the following findings and declarations of intent, which respectively discourage local governments from discriminating against competing private providers and assure the local governments's right to engage in lawful business practices in which private sector competitors are legally permitted to engage:
(6) To ensure that when a local government provides to its inhabitants cable television services, telecommunications services or advanced services, or any combination thereof, and competes with providers whose activities are regulated by the local government entity, the local government does not discriminate against the competing providers of the same services.

(7) To ensure that when a local government provides to its inhabitants cable television services, telecommunications services or advanced services, or any combination thereof, it will not be precluded from engaging in "bundling" those services or engaging in any other lawful business practice that its private-sector competitors are legally permitted to engage in.

(Emphasis added.)
Following the adoption of Louisiana's Fair Competition Act, the City of Lafayette proposed to offer broadband telecommunications services to its citizens. Lafayette's broadband communications system would employ FTTH technology, just one of a number of broadband technologies that include cable, digital subscriber line (DSL), fixed wireless, and broadband over powerline (BPL) satellites. FTTH technology delivers telecommunications services via fiber optic cables to every home and business in the covered area. In contrast, a more traditional system delivers services to a distant point, with the remaining distance to each home and business being covered by technically inferior and bandwidth-limiting copper (telephone) wires.
On July 15, 2005, the first step for developing Lafayette's proposed communications system was taken when a 62 to 38 percent majority of voters in the City of Lafayette approved, in a special election, the following bond proposition:
Shall the City of Lafayette, State of Louisiana ("the City"), issue its communications system revenue bonds in an amount not exceeding One Hundred *662 Twenty-Five Million Dollars ($125,000,000) to run not more than twenty-five (25) years from date of issuance to be sold at par, premium or discount with interest at a rate or rates not exceeding nine per centum (9%) per annum, for the purpose of constructing, acquiring, developing, extending and improving a local telephone, cable TV, high-speed fiber to the home (FTTH) Internet service and other related services, (the "Communications System") and, should the City determine that any bond proceeds are unnecessary for Communications System purposes, for repurchasing or paying any such bonds and for constructing, acquiring and improving the combined waterworks plant and system, electric power and light plant and system and sewer systems of the City (the "Utilities System"), including acquiring the necessary furniture, fixtures and equipment in connection with all the above described additions and improvements as established and set forth in the City's then current capital budget adopted after budget hearings held in the manner contemplated by the Home Rule Charter, paying the costs of issuance, funding a reserve for the bonds, and providing working capital, said bonds to be payable from the net income and revenues of the Communications System and to the amount necessary, from a secondary or subordinate pledge of the revenues of the Utilities System?
(Emphasis added.)
Following the approval of the above proposition, on September 6, 2005, defendants, Lafayette and its public utilities authority, acting in joint session, adopted Bond Ordinance No. 0-230-2005, which authorized Lafayette to incur debt and issue twenty-five year revenue bonds not exceeding $125 million to fund the proposed communications system in accordance with the bond proposition approved by Lafayette voters. However, in response to a challenge filed by Bellsouth Telecommunications, Inc., in which the plaintiffs in this case intervened, Lafayette was enjoined by the Louisiana Court of Appeal, Third Circuit, from issuing the bonds as authorized by Ordinance No. 0-230-2005. Bellsouth Telecommunications, Inc. v. City of Lafayette, 05-1478, 05-1505 (La.App. 3 Cir. 1/5/06), 919 So.2d 844.[12] In Bellsouth, *663 the court of appeal found that Bond Ordinance No. 0-230-2005 was invalid under the Fair Competition Act for two reasons: (1) because the bond repayment sections of the ordinance violated the provisions of La. Rev. 45.844.53(2), which provides that "[a] local government may not cross subsidize its covered services with . . . income from other local government or utility service," and (2) the bond ordinance provisions relative to the "pledge" of the revenues of the Lafayette Utilities System actually created an assignment of the revenues, which violates La.Rev.Stat. 45:844.52(3), a statute that allows a pledge, but not an assignment, of revenues of the utilities system.
On March 21, 2006, in response to the court of appeal's decision in Bellsouth Telecommunications, Lafayette adopted Bond Ordinance No. 0-053-2006, which was designed to supplement, amend, and restate in its entirety Ordinance No. 0-230-2005. The supplemental ordinance again authorized the incurrence of debt and issuance of communications system revenue bonds not exceeding $125 million to fund the proposed communications system in accordance with the bond proposition approved by Lafayette voters. Bond Ordinance No. 0-053-2006 further provided for the form of the revenue bonds, the rights of the bondholders, the payment of the bonds and the application of the proceeds, and for other matters in connection with the communications system bonds.
On April 21, 2006, the plaintiffs, residents of the City of Lafayette, filed a "Motion for Judgment," asserting that the newly-adopted Bond Ordinance No. 0-053-2006 violates certain provisions of the Fair Competition Act. The district court denied plaintiffs' motion for judgment. The court of appeal reversed the district court judgment in Naquin v. Lafayette City-Parish Consol. Gov't, 06-904 (La.App. 3 Cir. 8/10/06), 937 So.2d 900, ruling in favor of the challengers, just as it had ruled in favor of the challengers in Bellsouth, 05-1478, 05-1505, 919 So.2d 844. The court of appeal enjoined Lafayette from issuing the telecommunications bonds authorized by Bond Ordinance No. 0-053-2006. The court of appeal decision in Naquin is based on its finding that certain provisions of Bond Ordinance No. 0-053-2006 violate the Fair Competition Act's prohibition against "cross subsidization" of covered services with income from Lafayette's utility system, that is, La.Rev.Stat. 45:844.53(2). The court of appeal rejected all of the plaintiffs' other arguments.
This court granted Lafayette's application for supervisory writs to review the court of appeal decision enjoining the issuance of the bonds authorized by Bond Ordinance No. 0-053-2006. Naquin v. Lafayette City-Parish Consolidated Government, 06-2227 (La.10/13/06), 939 So.2d 352. The parties to this case, as well as a number of amici,[13] have submitted numerous arguments for this court's consideration. We must first determine whether the constitutional peremption principles set forth in La. Const. Art. 6 § 35 obviate the need to consider most, if not all, of the arguments set forth by the pleadings filed in this court.

PEREMPTION/MOTION TO STRIKE
La. Const. art. 6, § 35, relative to "Contesting Political Subdivision Bonds," provides as follows:

*664 (A) Contesting Election; Time Limit. For sixty days after promulgation of the result of an election held to incur or assume debt, issue bonds, or levy a tax, any person in interest may contest the legality of the election, the bond issue provided for, or the tax authorized, for any cause. After that time no one shall have any cause or right of action to contest the regularity, formality, or legality of the election, tax provisions, or bond authorization, for any cause whatsoever. If the validity of any election, tax, debt assumption, or bond issue authorized or provided for is not raised within the sixty days, the authority to incur or assume debt, levy the tax, or issue the bonds, the legality thereof, and the taxes and other revenues necessary to pay the same shall be conclusively presumed to be valid, and no court shall have authority to inquire into such matters.
(B) Contesting Ordinance or Resolution; Time Limit. Every ordinance or resolution authorizing the issuance of bonds or other debt obligation by a political subdivision shall be published at least once in the official journal of the political subdivision or, if there is none, in a newspaper having general circulation therein. For thirty days after the date of publication, any person in interest may contest the legality of the ordinance or resolution and of any provision therein made for the security and payment of the bonds. After that time, no one shall have any cause of action to test the regularity, formality, legality, or effectiveness of the ordinance or resolution, and provisions thereof for any cause whatever. Thereafter, it shall be conclusively presumed that every legal requirement for the issuance of the bonds or other debt obligation, including all things pertaining to the election, if any, at which the bonds or other debt obligation were authorized, has been complied with. No court shall have authority to inquire into any of these matters after the thirty days.
(Emphasis added.) This constitutional provision establishes strict time limitations during which "persons in interest" are allowed to challenge an election or an ordinance authorizing a political subdivision to issue bonds. Pursuant to La. Const. art. 6, § 35(A), when an election approving a bond referendum has been held, persons in interest are allowed "sixty days from the promulgation of the result of [the] election" to "contest the regularity, formality, or legality of the . . . bond authorization." (Emphasis added.) Pursuant to La. Const. art. 6, § 35(B), when a political subdivision has adopted an "ordinance . . . authorizing the issuance of bonds," persons in interest are allowed "thirty days after the date of publication" to "contest the legality of the ordinance . . . and of any provision therein made for the security and payment of the bonds." (Emphasis added.) Under both subsections A and B of La. Const. art. 6, § 35, once the time period has passed, the validity of the bond election [§ 35(A)] or ordinance [§ 35(B)]is "conclusively presumed valid" and "no court shall have authority to inquire into any of [the] matters" that are the subject of the election or ordinance.
Lafayette voters approved the bond proposition authorizing the issuance of the communications bonds at a special election held on July 15, 2005. The referendum approved by the voters on that date authorized Lafayette to issue twenty-five year revenue bonds not exceeding $125 million to provide capital funds for the communications system, then provided that the bonds issued would be "payable first from the net income and revenues of the communications system and second, to *665 the amount necessary, from a secondary or subordinate pledge of the revenues of the utilities system." (Emphasis added.) Although the date of promulgation of the result of the bond election is not clear from the record evidence in this case, the parties agree that no person in interest contested any provision of the bond election during the 60-day period following promulgation of the results of the election, as allowed by La. Const. art. 6, § 35(A).
Bond Ordinance No. 0-053-2006, authorizing the issuance of the communications system bonds, was adopted by Lafayette on March 21, 2006. Three days later, on March 24, 2006, the ordinance was published in the Lafayette Daily Advertiser, the local newspaper, thus tolling the 30-day time period during which persons in interest could challenge the ordinance. La. Const. art. 6, § 35(B). On April 21, 2006, within the 30-day period, plaintiffs herein timely filed their "Motion for Judgment Pursuant to La. R.S. 13:5125."[14] As required by the provisions of that statute, plaintiffs' petition was published in the Lafayette Daily Advertiser on May 2 and May 9, 2006.
On April 23, 2006, the last day of the 30-day period for challenging the ordinance that began when the ordinance was published in the local newspaper on March 24, 2006, Bellsouth Telecommunications, Inc. and Louisiana Cable & Telecommunications Association (hereinafter referred to collectively as "Bellsouth") filed by facsimile transmission an additional "La. R.S. 13:5125 Motion for Judgment," in which Bellsouth recited certain issues and set forth its own arguments for declaring the ordinance invalid. However, according to testimony from the Lafayette Parish Clerk of Court, Bellsouth did not file either a hard copy of its motion or the filing fees, as required by La.Rev.Stat. 13:850, as a consequence of which the facsimile filing of the motion had "no force or effect." La. Rev.Stat. 13:850(C).[15]
*666 Along with the motion for judgment that Bellsouth attempted to file by facsimile on the last day of the 30-day period for contesting Bond Ordinance No. 0-053-2006, Bellsouth had filed a "Memorandum in Support" of its motion. On May 9, 2006, some 16 days after the expiration of the 30-day constitutional peremption period for filing challenges to the 2006 bond ordinance, plaintiffs herein filed a "Motion, Incorporated Memorandum and Order for Leave to file Plaintiffs' Supplemental Memorandum in Support of La. R.S. 13:5125 Motion for Judgment." Plaintiff's "Supplemental Memorandum," which was attached to that motion, duplicated, that is, recited virtually word for word, the "Memorandum in Support" that had been filed by Bellsouth on April 23, 2006, with its motion for judgment. This is the motion that La.Rev.Stat. 13:850(C) directs-because Bellsouth failed to file an original signed document, or pay the filing fee and transmission fee within five days of its filing by facsimile-shall have "no force or effect." In their motion to file the supplemental memorandum, plaintiffs asserted that they had "had an opportunity to further research the issues presented" in their motion for judgment, that the memorandum was submitted "to assist the Court in analyzing the issues." Perhaps contemplating the very peremption argument later raised by Lafayette in its exception and motion to strike, plaintiffs further asserted that the supplemental memorandum did "not raise new issues, but rather, further explains the plaintiffs' positions and arguments with regard to issues already raised in the motion."
Lafayette responded to the plaintiff's supplemental memorandum by filing exceptions and a motion to strike, in which it asserted that plaintiffs in fact did raise new issues in their supplemental memorandum, and that the newly raised issues are perempted under La. Const. art. 6, § 35(B), because they were not asserted prior to the lapse of the constitutional period, they were not briefed in the plaintiffs' memorandum supporting its motion, and they were not contained in the May 2 and May 9, 2006, advertisements of plaintiffs' pleadings. According to Lafayette, La.Rev.Stat. 13:5125(B) requires that the advertisements give notice to the public of all the challenges to the bond ordinance, but the advertisements published by the plaintiffs did not give notice of the issues raised for the first time in the plaintiffs' supplemental memorandum.[16]
Following a hearing on Lafayette's exceptions and motion to strike the portions of the plaintiffs' supplemental memorandum that raise new issues not raised in their timely-filed motion for judgment, the district court granted the exception "to the extent that the Supplemental Memorandum expands the pleadings." The district court found that plaintiffs would be "limited to the initial pleadings, . . . notwithstanding what's contained in the memorandum." The district court later denied plaintiffs' motion for judgment challenging Bond Ordinance No. 0-053-2006.
*667 At the court of appeal, plaintiffs assigned as error the district court's partial granting of Lafayette's motion to strike their supplemental memorandum, arguing that the memorandum was not perempted because "it addressed the same issues set forth in the motion for judgment and did not expand its scope in any manner." Naquin, 06-0904, p. 6, 937 So.2d at 904. Plaintiffs also asserted that the district court's ruling on this issue should be reversed because the court ultimately allowed argument on the purportedly stricken issues. Id. The court of appeal found that, despite the strict peremptive provisions of La. Const. art. 6, § 35(B), district courts have discretion to accept legal memoranda after the 30-day period. Nevertheless, the court of appeal found no manifest error in the district court's decision partially granting Lafayette's exception of peremption and motion to strike. Thus, the court of appeal stated as follows: "To the extent the supplemental memorandum asserted challenges to the Bond Ordinance that were not included in the motion for judgment, those new assertions were, however, perempted." Id. at 8, 937 So.2d at 906. The court of appeal later granted plaintiffs' motion and enjoined the issuance of the bonds authorized by the ordinance based on its finding that the bond ordinance violates the Fair Competition Act.
In its briefs to this court, Lafayette claims that the court of appeal decision enjoining the issuance of the bonds should be reversed because the entire decision is based on the court of appeal's consideration of issues that Louisiana courts have no authority to consider because they were not raised within the constitutional peremption periods set forth in La. Const. art. 6, § 35. Lafayette's primary argument is that many of the plaintiffs' claims are perempted under La. Const. art. 6, § 35(B), which requires that challenges to bond ordinances be filed within 30 days of publication. According to Lafayette, the issues the court of appeal considered were raised for the first time, not in the plaintiff's timely-filed motion for judgment, but in the plaintiffs' supplemental memorandum filed after the expiration of the 30-day period. Both the district court and the court of appeal ruled that any issues raised for the first time in plaintiff's supplemental memorandum, and not in their timely motion for judgment, were not properly before the court because they are perempted. However, Lafayette asserts that, despite this correct ruling, the court of appeal improperly based its decision on issues raised for the first time in plaintiffs' supplemental memorandum.
Alternatively, Lafayette has asserted in this court that some of the issues raised by plaintiffs are actually perempted by La. Const. art. 6, § 35(A), which requires that challenges to bond referendum elections be filed within 60 days of promulgation of the election. According to Lafayette, some of the plaintiffs' arguments attack provisions of the bond referendum itself. Those issues are perempted, Lafayette asserts, because no one filed a timely challenge to the referendum within the 60-day period, meaning that every provision of the referendum is "conclusively presumed to be valid." La. Const. art. 6, § 35(A).
Only one Louisiana case has addressed an issue similar to the one presented herein. In Lege v. Vermilion Parish School Board, qualified electors and taxpayers challenged the validity of a bond election by timely filing a petition via ordinaria that did not conform to the procedural requirements of La.Rev.Stat. 13:5121 et seq., relative to "Suits to determine validity of government bonds." 360 So.2d 664 (La.App. 3 Cir.1978). The pertinent statutes require the timely filing of a motion for judgment, as the plaintiffs herein have done. The Lege court held that the petition *668 via ordinaria did not state a cause of action. Id. at 667. More pertinent to the issue presented by this case, the court further found that a supplemental pleading that properly complied with the requirements for setting forth a challenge to the bond election that was filed by plaintiffs after the peremptive period did not relate back to the date of the filing of the original petition that did not state a cause of action. Id. Thus, the court dismissed the plaintiffs' challenge to the bond election in Lege.
The decision in Lege is based, at least partially, on this court's statements in Andrieux v. East Baton Rogue Parish School Board, in which the court held that the constitutional time period for challenging bond elections and ordinances set forth in La. Const. art. 6, § 35, establishes a peremptive, not a prescriptive period. 254 La. 819, 227 So.2d 370 (1969). See also Denham Springs Economic Development Dist. v. All Taxpayers, Property Owners and Citizens of Denham Springs Economic Development Dist. 2005-2274, p. 20 (La.10/17/06), 945 So.2d 665, 679. In the Andrieux case, this court noted that it has "strictly adhered to the view that the constitutional and statutory peremptive period operates as a complete extinguishment of the right to attack bond and tax elections." 227 So.2d at 371(emphasis added) and cases cited therein. This court has distinguished between peremptive periods and prescriptive periods as follows:
Peremption differs from prescription in several respects. Although prescription prevents the enforcement of a right by legal action, it does not terminate the natural obligation; peremption, however, extinguishes or destroys the right (La. Civ.Code Art. 3458). Public policy requires that rights to which peremptive periods attach are to be extinguished after passage of a specified period. Accordingly, nothing may interfere with the running of a peremptive period. It may not be interrupted or suspended; nor is there provision for its renunciation. And exceptions such as contra non valentem are not applicable. As an inchoate right, prescription, on the other hand may be renounced, interrupted, or suspended; and contra non valentem applies an exception to the statutory prescription period where in fact and for good cause a plaintiff is unable to exercise his cause of action when it accrues.
Hebert v. Doctors Memorial Hospital, 486 So.2d 717, 723 (La.1986) (emphasis added), quoted in State Bd. of Ethics v. Ourso, 02-1978, p. 4 (La.4/9/03), 842 So.2d 346, 349, and Reeder v. North, 97-0239, p. 12 (La.10/21/97), 701 So.2d 1291, 1298.
On the basis of the above authorities, we find, as did the court of appeal, that the district court's decision to partially grant Lafayette's exception of peremption and motion to strike was not in error. In addition to the well-settled principles concerning peremptive periods that are quoted above, this conclusion is supported by the strict language of La. Const. art. 6, § 35, both subsections of which (A & B) specifically provide that Louisiana courts have no authority to "inquire into" matters related to bond referendum elections and ordinances unless a challenge is properly raised within the respective constitutional peremption periods. That provision further deprives persons in interest of "any cause of action to test the regularity, formality, legality, or effectiveness of the ordinance or resolution, and provisions thereof for any cause whatever," after the passage of the time limitations. Id. Finally, La. Const. art. 6, § 35(A), provides that "it shall be conclusively presumed that every legal requirement for the issuance of the bonds or other debt obligation, including all things pertaining to the election, if any, at which the bonds or other debt *669 obligation were authorized, has been complied with." The intent of the framers of the Constitution to prohibit any challenge not raised within the constitutional time limitations is clear and unambiguous. Given the fact that this provision is clearly designed to govern the right of citizens to challenge bond elections and ordinances, we find that it is also intended to limit the rights of parties who have timely raised challenges to expand their pleadings to raise new issues after the passage of the constitutional peremptive period, even if the expansion is presented in the guise of supplemental argument.
In the context of the facts of this case, this conclusion has at least two implications. First, regarding the bond referendum, because no challenge to the bond election itself was raised within the 60-day peremptive period established by La. Const. art. 6, § 35(A), all the provisions of the bond referendum, including Lafayette's right to pay the bonded indebtedness "from a secondary or subordinate pledge of the revenues of the utilities system," are conclusively presumed valid and any right the plaintiffs herein may ever have had "to contest the regularity, formality, or legality of the election, tax provisions, or bond authorization, for any cause whatsoever" was extinguished when that 60-day period expired. See Denham Springs Economic Development Dist., 2005-2274, p. 20. Second, regarding provisions of the bond ordinance (as opposed to the bond referendum), once the 30-day period from publication of the ordinance in the local newspaper expired, no one had "any cause of action to test the regularity, formality, legality, or effectiveness of the ordinance or resolution, and provisions thereof for any cause whatever," such that new challenges to the ordinance could not be raised after that period. La. Const. art. 6, § 35(B). Thus, neither this court nor the court of appeal has "authority to inquire" into any issue not timely raised in the plaintiffs' motion for judgment to the bond ordinance.
In their motion for judgment, plaintiffs herein set forth a number of arguments that are summarized as follows:
1. The ordinance should be declared invalid because it seeks to pledge the "residual revenues" of Lafayette's utility system, despite the fact that those revenues are the subject of pending litigation between the plaintiffs and Lafayette. [Paragraphs 6 and 8]
2. The ordinance should be declared invalid because the pledge of the residual revenues is "primary" rather than "secondary" or "subordinate" since the Feasibility Study Report forecasts that the communications system will not generate sufficient revenues to meet the bond obligations until at least 2009. [Paragraph 7]
3. The ordinance should be declared invalid because it requires Lafayette to maintain and collect sufficient monies from the utilities system to pay amounts due on the communications system bonds, contrary to statements on the Lafayette Utility System website that funding for the communications system will be based on any utility rate increases. [Paragraph 8]
4. The ordinance should be declared invalid because it defines "revenues" of the communications system to include loans, while the bond proposition voted on by Lafayette citizens did not contemplate the use of loans to pay the bonded indebtedness. [Paragraph 9]
5. The ordinance should be declared invalid because it is "in irreconcilable conflict" with the bond proposition, in that the proposition refers to a pledge of "revenues" of the utility system, while *670 the ordinance refers to the pledge of "residual revenues." [Paragraph 10]
6. The ordinance should be declared invalid because it violates the prohibition against "cross-subsidization" established by the Fair Competition Act by providing for the payment of bonded indebtedness of the communications systems from the "residual revenues" of the utilities system. [Paragraphs 11 and 12]
7. The ordinance should be declared invalid because it violates the provision of the Fair Government Competition Act that requires the establishment and maintenance of a "single enterprise fund" to account for Lafayette's operation of the communications system by setting up multiple separate accounts, sub-account and funds within the accounting system of the communications system. [Paragraph 13]
8. The ordinance should be declared invalid because it illegally attempts to establish a "payment-in-lieu-of tax" scheme that would result in artificially inflated rates and fees charged to customers of the communications system services to generate monies for diversion to Lafayette's general fund. [Paragraph 14]
On the other hand, the arguments set forth in plaintiffs' supplemental memorandum, duplicating the memorandum filed by Bellsouth in support of its motion for judgment that had "no force or effect," may be summarized as follows:
1. The bond ordinance should be declared invalid because the provisions relative to the pledge of the residual revenues of the utilities system violate the Fair Competition Acts' prohibition against "cross-subsidization," and actually create an assignment of the revenues, rather than a pledge, particularly because the "credit event" provisions create a "false default."
2. The bond ordinance should be declared invalid because it improperly authorizes loans without restriction to be used for any purpose, including paying off bonded indebtedness, and without including an interest rate, as required by the Fair Competition Act.
Although both of the lower courts partially granted Lafayette's exception of peremption and motion to strike the portions of the plaintiffs' supplemental memorandum that raised new issues not set forth in their original motion for judgment, neither court provided any analysis concerning which such issues were perempted. On the basis of our careful comparison of plaintiff's supplemental memorandum to their original motion for judgment, we find that, under no reasonable reading of plaintiffs' original motion for judgment, can it be considered to incorporate the first issue set forth in plaintiffs' supplemental memorandum and summarized above. Although the timely-filed motion for judgment did raise some issues relative to the pledge provisions in the ordinance, it did not raise the issue asserted in the supplemental memorandum. The only issues raised relative to the pledge of the utilities system revenues in the plaintiffs' original motion for judgment are (1) plaintiffs' claim that those revenues cannot be pledged to secure payment of the communications system bonds because these revenues are the subject of a previously-filed lawsuit,[17] and *671 (2) plaintiffs' claim that the pledge of the revenues is "primary," rather than secondary or subordinate, with the bond election only allowing a secondary or subordinate pledge of the revenues. In contrast, the gravamen of the plaintiff's argument concerning the pledge of the revenues of the utility system in their supplemental memorandum is that the provisions of Bond Ordinance No. 0-053-2006 actually create an assignment of the revenues, which, plaintiffs assert, is not a "true pledge." Because none of plaintiffs' arguments in their original motion for judgment had to do with whether the bond ordinance provisions create a "true pledge" of the revenues of the utilities system, and because the arguments or issues to that effect contained in their supplemental memorandum were not timely raised, they are perempted.
That the issue regarding pledge of revenues of the utilities system was not raised in the plaintiffs' only timely motion and was thus perempted is significant because, not only was the court of appeal decision enjoining issuance of the bonds based largely on that issue, but much of the parties' briefs and virtually all of the amici briefs presented in this court are focused on that issue. Because that issue is perempted, none of the arguments set forth in the multiple filings to this court will be further discussed herein.
Regarding the second issue set forth in plaintiffs' supplemental memorandum and summarized above-i.e., whether Bond Ordinance No. 0-053-2006 allows Lafayette to use loans to pay bonded indebtedness in violation of the Fair Competition Act, we find that plaintiff's timely-filed motion for judgment did properly raise that issue and that the plaintiff's further arguments on the issue in their supplemental brief are therefore not perempted. Plaintiffs specifically alleged in Paragraph 9 of their motion for judgment that the bond ordinance improperly defines "revenues" of the communications system to include loans. The plaintiffs' allegations to that effect can reasonably be read to include the arguments set forth by plaintiffs' supplemental memorandum relative to the improper use of loans for payment of bonded indebtedness. Thus, plaintiffs' claim that the 2006 bond ordinance unlawfully allows Lafayette to use loan proceeds to pay bonded indebtedness is not perempted.
The court of appeal rejected the claim of plaintiffs that the bond ordinance impermissibly allows the use of loans to pay bonded indebtedness. See Naquin, p. 17, 937 So.2d at 911. In fact, the court of appeal specifically found that none of the 2006 bond provisions are directed at Lafayette's being able to use loans for the purpose of paying bonded indebtedness. Id. In their opposition brief to this court, plaintiffs reassert their argument that Section 5.1 of Bond Ordinance No. 0-053 violates the Fair Competition Act because it improperly allows Lafayette to use loans without restriction, including to pay bonds. We have examined that section of the 2006 bond ordinance and find no merit in plaintiffs' arguments for three reasons.
First, plaintiffs' claim that Bond Ordinance No. 0-053-2006, § 5.1, allows Lafayette to use loans without restriction has no merit. In fact, the 2006 bond ordinance specifically restricts Lafayette's right to use loans, by specifying that loans may only be used for purposes "consistent with Applicable law." Second, regarding their *672 more specific claim that the 2006 bond ordinance improperly allows Lafayette to use loans to pay bonded indebtedness, plaintiffs have not pointed to any provision of Bond Ordinance No. 0-053-2006 that allows the use of loans for that purpose. Third, plaintiffs' claim that the 2006 bond ordinance allows Lafayette to use loans to pay bonded indebtedness is intertwined with two of their other arguments, both of which we reject. Plaintiffs' allegation concerning the improper use of loans is part and parcel of their claim that the "pledge" provisions of the bond ordinance do not create a "true pledge," and we do not address those arguments because they are perempted, since they were not included in plaintiffs' timely-filed motion for judgment. Their allegation that the 2006 bond ordinance allows Lafayette to use loans improperly is also intertwined with plaintiffs' claim that Bond Ordinance 0-053-2006 violates the Fair Competition's Act's prohibition against cross subsidization. That claim is rejected for the reasons discussed below in the section of this opinion regarding interpretation of the Fair Competition Act.
Regarding plaintiffs' other claims for enjoining issuance of the bonds that were properly set forth in their original motion for judgment, none of which are perempted, the court of appeal did not address those arguments and plaintiffs have failed to pursue them here.[18] Further, to the extent that plaintiffs' opposition brief may be construed, however indirectly, to address any of those issues, we find plaintiffs' arguments unpersuasive. The only remaining issue that was both set forth in the plaintiffs' original motion for judgment and not rejected by the court of appeal is their argument in paragraphs 11 and 12 that Bond Ordinance No. 0-053-2006 violates the prohibition against cross subsidization set forth in the Fair Competition Act. The court of appeal decision enjoining the issuance of the bonds authorized by Bond Ordinance No. 0-053-2006 was based, at least in part, on its acceptance of the plaintiffs' argument on this issue, to which we now turn.
We begin our discussion by outlining the pertinent statutory provisions of the Fair Competition Act and by addressing the proper interpretation to be given those provisions.

FAIR COMPETITION ACT
Louisiana's Fair Competition Act contains a number of statutes that govern various matters related to the development, financing, implementation, construction, and operations of a telecommunications system by a "local government." Particularly pertinent to the issues presented by this case are the following statutory provisions:

*673 La.Rev.Stat. 45:844.52. Bonding authority
A. The local governing authority may by resolution determine to issue one or more bonds to finance the capital costs for facilities necessary to provide to subscribers one or more covered services.
B. The resolution shall:
(1) Describe the purpose for which the indebtedness is to be created.
(2) Specify the dollar amount of the one or more bonds proposed to be issued.
C. (1) A bond issued under this Section shall be secured and paid for solely from the revenues generated by the local government from providing the covered services.
* * * * *
(3) Nothing in this Chapter shall preclude a local government that owns and operates electric, water, gas, sewer and other utilities from pledging the resources of such utilities to obtain the best available interest rates, terms and conditions for the bonds necessary to finance the facilities used to provide the proposed covered services.
* * * * *
La.Rev.Stat. 844.53. General operating limitations
(1) A local government that provides a covered service under this Chapter is subject to all applicable provisions of local, state and federal law, including applicable rules of the Louisiana Public Service Commission.
(2) A local government may not cross-subsidize its covered services with tax dollars, income from other local government or utility services, below-market rate loans from the local government or any other means.
(Emphasis added.)
The two statutes quoted above address two separate and distinct phases related to the implementation and ownership of telecommunications systems by local governments. La.Rev.Stat. 45:844.52 governs "Bonding authority," while La.Rev. Stat. 45:844.53 governs "General operating limitations." Relative to bonding authority, La.Rev.Stat. 45:844.52(A) allows a local government to issue bonds to finance "capital costs for facilities" that are to be put in place before the telecommunications system can provide "covered services" to subscribers. In that regard, La.Rev.Stat. 45:844.52(B) requires that the resolution or ordinance describe the purpose of the indebtedness and specify the amount of the proposed bonds. The statute then provides that the bonds issued "shall be secured and paid for solely from the revenues generated by the local government from providing the covered services," but also specifies that the local government is not precluded, if it owns a utilities system, from pledging the resources of its utilities system to secure the bonds. La.Rev.Stat. 45:844.52(C)(1) & (3).
An independent section of the Fair Competition Act, La.Rev.Stat. 45:844.53, describes general limitations relative to operation of the telecommunications system after it goes on line and starts providing covered services to subscribers. That statute provides that a local government operating a telecommunications system is subject to applicable local, state, and federal laws, including Louisiana Public Service Commission rules. La.Rev.Stat. 45:844.53(1). La.Rev.Stat. 45:844.53(2) then provides that a local governing authority operating a telecommunication systems is not at liberty to use tax dollars or income from other local utility services to *674 "cross subsidize" their operation of "covered services." Further, money may not be borrowed from other divisions of a local governing authority operating a telecommunications system in the form of below market-rate loans. Id. Inferentially, a local government operating a telecommunications system may borrow money to pay for covered services from other divisions of the local governing authority, including the utilities system, so long as the loans include market-rate interest. Id.
The fact that the two statutes are designed to govern two entirely separate and distinct phases is apparent, not just from the title of the two statutes and the summary of their contents set forth above, but also from the types of costs that the two statutes are designed to govern. La.Rev. Stat. 45:844.52, relative to bonding authority, governs the issuance of bonds, the proceeds from which are expressly to be used to pay "capital costs for facilities." On the other hand, La.Rev.Stat. 45:844.53, relative to limitations on general operations, makes no mention of "capital costs," but instead provides that the local governing authority cannot "cross subsidize its covered services" with "income" from utility services. The word "cross subsidize" is defined in La.Rev.Stat. 45:844.43, the definitions section of the Fair Competition Act, as follows: "to pay a cost included in the direct costs or indirect costs of providing a covered service." Thus, the bonding authority provision, La.Rev.Stat. 45:844.52, concerns itself only with "capital costs," while the prohibition against cross-subsidization in La.Rev.Stat. 45:844.53 concerns itself with "direct costs" and "indirect costs." The three types of costs associated with telecommunications systems are defined by La.Rev.Stat. 45:844.43 as follows:
(3) "Capital costs" means all costs of providing a service that are capitalized in accordance with generally accepted accounting principles.
* * * * *
(8) "Direct costs" means those expenses of a local government that:
(a) Are directly attributable to providing a covered service.
(b) Would be eliminated if the service described in Subparagraph (8)(a) was not provided by the local government.
* * * * *
(14)(a) "Indirect costs" means any costs:
(i) Identified with two or more services or other functions
(ii) That are not directly identified with a single service or function.
(b) "Indirect costs" may include cost factors for administration, accounting, personnel, purchasing, legal support, and other staff or departmental support.
These definitions further demonstrate that La.Rev.Stat. 45:844.52, relative to bonding authority to cover capital costs, governs a completely separate phase from La.Rev. Stat. 45:844.53, which regulates only general operations and addresses the payment of direct and indirect costs.
The above distinction between the two statutes must be clearly understood before assessing whether Bond Ordinance No. 0-053-2006, challenged by the plaintiffs herein, violates Louisiana's Fair Competition Act. As we have found, the two statutes govern separate and distinct financial needs related to a local government's ownership of a telecommunications system. Clearly, the only statute relevant to interpretation of the bond ordinance at issue here is the provision governing bonding authority to finance capital costs for facilities, La.Rev.Stat. 45:844.52. It follows that the other provision, La.Rev.Stat. *675 45:844.53, which expressly establishes general limitations on operations, and does not mention either bonds or capital costs, has no application to the bond ordinance plaintiffs challenge. La.Rev.Stat. 45:844.53 is an important part of the statutory scheme; however, it does not become applicable until a local government has its telecommunications system up and running, providing covered services to subscribers, and finding need to pay direct and indirect costs for the system.
And, that is where the court of appeal erred in this case: by applying the statute relative to general operating limitations to an ordinance regarding bonding authority. When the court of appeal considered whether Bond Ordinance No. 0-053-2006 violated the Fair Competition Act, it looked at both La.Rev.Stat. 45:844.52, the statute governing bonding authority, and La.Rev.Stat. 45:844.53, the statute governing general operating limitations. In fact, the court of appeal considered whether the bond ordinance violated either of the two statutes, when in fact only one applies to the bonding phase of a telecommunications project, without recognizing that they expressly govern separate and distinct phases related to a local government's ownership of a telecommunications system. Relevantly, a careful review of the court of appeal decision reveals that it contains separate conclusions about whether the bond ordinance complied with each of the two statutes. The court of appeal found that Bond Ordinance No. 0-053-2006 complies with the requirements of La.Rev.Stat. 45:844.52, the bonding authority statute, stating as follows:
We find, initially, that Section 4.1 [of Bond Ordinance 0-053-2006] complies with the Fair Competition Act's mandate that bonds issued are to be paid for with funds generated from the communications system enterprise. See La. R.S. 45:844.52(C)(1). [Lafayette's] pledge of revenues from its existing Utilities System as security for the bonds is also permissible under the Fair Competition Act. See id.

As we have found, La.Rev.Stat. 45:844.52 is the only statute pertinent to the validity of the bond ordinance, because it is the only statute in the Fair Competition Act pertinent to bonding authority to finance capital costs for facilities. Thus, the court of appeal had no reason to go further and assess whether the bond ordinance complies with La.Rev.Stat. 45:844.53, because La.Rev.Stat. 45:844.53 has no application to the bonding phase of the telecommunications project. Furthermore, plaintiffs have not challenged the court of appeal's holding that the bond ordinance complies with La.Rev.Stat. 45:844.52, the only applicable statute.
However, the court of appeal went on to its second conclusion and found that the bond ordinance violated the prohibition against cross subsidization set forth in La. Rev.Stat. 45:844.53, which is the inapplicable provision governing general operations and cross subsidization to pay direct and indirect costs. It is on the basis of its improper finding that certain provisions of the ordinance violate the prohibition against cross subsidization set forth in La. Rev.Stat. 45:844.53 that the court of appeal granted the plaintiffs' motion for judgment and enjoined the issuance of the bonds. Because it is based on the court of appeal's improper consideration of the requirements of an inapplicable statute, we reverse the decision of the court of appeal enjoining the issuance of the bonds.
In closing, we note that this opinion does not address the issue that was the subject of the majority of the briefs of the parties and the amici in this court, i.e., whether the provisions of Bond Ordinance No. 0-053-2006 governing the pledge of the revenues *676 of Lafayette's utilities system constitute a "true pledge" under Louisiana law. There are actually two reasons that it is unnecessary, and in fact inappropriate, for this court to rule on that issue. First, as we have already held, this issue and the plaintiffs' arguments in that regard are perempted because they were not set forth in their timely-filed motion for judgment, but rather were raised for the first time in plaintiffs' supplemental memorandum filed after the expiration of the 30-day constitutional peremption period for challenging provisions of a bond ordinance. La. Const. art. 6, § 35(B). Second, even if those issues had not been perempted, plaintiffs' arguments relative to the "true" character of the "pledge" of the utility system revenues no longer have any relevance in light of the court of appeal's finding that the bond ordinance complies with the only applicable statute in the Fair Competition Act. Because plaintiffs have not challenged that finding in this court, the merits of the plaintiffs' arguments concerning whether the pledge provisions constitute a "true pledge" are not before us and need not be addressed.

DECREE
For the foregoing reasons, the court of appeal decision enjoining the issuance of the bonds authorized by Bond Ordinance 0-053-2006 is reversed and the plaintiffs' demand that issuance of the bonds be enjoined is denied.
REVERSED; DISTRICT COURT JUDGMENT REINSTATED.
NOTES
[1] Lennard G. Kruger & Angele A. Gilroy, "IB10045: Broadband Internet Access: Background and Issues," CRS Issue Brief for Congress (Washington, D.C.: Congressional Research Service, Library of Congress, 2006), at http://www.opencrs.com/document/IB10045 (last visited on Feb. 8, 2007).
[2] Id.
[3] Glenn J. McLoughlin, "IB 95051: The National Information Infrastructure: The Federal Role," CRS Issue Brief for Congress (Washington, D.C.: Congressional Research Service, Library of Congress, 2000), at http://www.opencrs.com/document/IB95051/ (visited Feb. 8, 2007). (Emphasis in original).
[4] Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56.
[5] McLoughlin, supra.
[6] Kruger & Gilroy, supra.
[7] Charles B. Goldfarb, "Telecommunications Act: Competition, Innovation, and Reform," CRS Report for Congress (Washington, D.C.: Congressional Research Service, Library of Congress, 2006).
[8] Kruger & Gilroy, supra.
[9] Id.
[10] Id.
[11] According to an article in the January 11, 2005, issue of the national newspaper USA Today, "Bellsouth, Cox and others worked with the Lafayette Utility System (LUS) to develop the Fair Competition Act." William A. Oliver, "Competition Should Be Fair," USA Today, (Gannett Co., Inc., 2005), at http://www.lexis.com/research/retrieve?-m= 2502c089c1195bcd3c18b6b717e5985c & doc (last visited on Dec. 18, 2006).
[12] The effect of the court of appeal's decision in the earlier Bellsouth opinion has been raised in this case. For example, Lafayette filed an exception of res judicata in the district court, arguing that "multiple claims asserted by the plaintiffs in the pending challenge to Bond Ordinance 0-053-2006 were barred because those identical claims had been decided [in the Bellsouth case] and were final." Naquin, 06-0904 at 4, 937 So.2d at 903. The court of appeal rejected Lafayette's res judicata plea, stating as follows: "The 2006 Ordinance constitutes a new Ordinance which, pursuant to La. R.S. 13:5122, is wholly subject to challenge by any interested person via procedures set forth in the Bond Validation Law." Id. at 10, 937 So.2d at 907.

In this court, plaintiffs have argued that Lafayette is prohibited from raising certain issues because it failed to seek supervisory review of the Bellsouth decision from this court. However, we reject that argument. The court of appeal correctly found that Bond Ordinance 0-053-2006 is a wholly new bond ordinance subject to wholly new challenges. It follows logically that, if the plaintiffs are not bound by the Bellsouth decision concerning rulings against their interests, neither is the defendant bound by rulings against its interests in the Bellsouth decision. The plaintiffs are entitled to raise any arguments allowed by law against the 2006 Ordinance, and Lafayette is entitled to defend its ordinance by making any and all legal arguments against the plaintiffs' challenges, even if the same or similar arguments were rejected by the court of appeal's final decision in the separate Bellsouth case, because, as the court of appeal found, this case involves a wholly new bond ordinance subject to wholly new challenges.
[13] Amici curiae briefs have been submitted by the following entities: (1) the Louisiana Public Service Commission ("LPSC"), (2) the Louisiana Municipal Association ("LMA"); and (3) the Fiber to the Home Council. All of these amici are aligned with Lafayette in challenging the court of appeal decision enjoining issuance of the bonds authorized by Bond Ordinance No. 0-053-2006.
[14] La.Rev.Stat. 13:5125, relative to "Contesting issuance of bonds or action taken with respect to source of payment therefor," provides as follows:

Any person, corporation or association desiring to contest or enjoin the issuance of any such bonds or action taken providing for a new or different source of payment for outstanding bonds shall proceed by motion for judgment brought in the court having jurisdiction as provided in R.S. 13:5123. Upon the filing of any such motion for judgment, the court shall enter an order within five days following such filing requiring the publication of the motion in some newspaper published in or having general circulation in such governmental unit two times within a period of fifteen consecutive calendar days from the date of the issuance of the order specifying the dates for publication thereof, with the first publication as hereinabove provided to be not later than eight days from and after the date of the issuance of the order, and at the same time fix a time and place for hearing the proceeding, which time and place shall be published with the motion for judgment. The date fixed for the hearing shall be at least ten days, but not more than thirteen days, after the second publication of such motion for judgment. In addition to such publication, the plaintiff must secure personal service at least five days prior to the second publication of the motion for judgment on at least one member of the governing body of the governmental unit whose actions or proceedings are sought to be contested or enjoined.
[15] La.Rev.Stat. 13:850 provides, in pertinent part, as follows:

A. Any paper in a civil action may be filed with the court by facsimile transmission. All clerks of court shall make available for their use equipment to accommodate facsimile filing in civil actions. Filing shall be deemed complete at the time that the facsimile transmission is received and a receipt of transmission has been transmitted to the sender by the clerk of court. The facsimile when filed has the same force and effect as the original.
B. Within five days, exclusive of legal holidays, after the clerk of court has received the transmission, the party filing the document shall forward the following to the clerk:
(1) The original signed document.
(2) The applicable filing fee, if any.
(3) A transmission fee of five dollars.
C. If the party fails to comply with the requirements of Subsection B, the facsimile filing shall have no force or effect. The various district courts may provide by court rule for other matters related to filings by facsimile transmission.
(Emphasis added.)
[16] The advertisements contained verbatim copies of plaintiffs' original motion for judgment filed on April 21, 2006. No new advertisements were published after the plaintiffs' filed their supplemental memorandum.
[17] Because the court of appeal did not address this issue, the plaintiffs' arguments on this issue are deemed rejected. Because plaintiffs' did not file a writ application in this court challenging any portion of the court of appeal judgment, the court of appeal's rejection of this and other of the plaintiffs' arguments is final, as we find herein, infra. However, we also note that this argument is perempted because plaintiffs failed to timely challenge the bond election itself, and the bond referendum election spoke to the pledge of the utility system revenues.
[18] Falling into this category are the following arguments set forth in plaintiffs' original motion for judgment: (1) arguments in paragraphs 6 and 8 that the utilities system revenues cannot be pledged to secure the communications bonds because they are the subject of a previously-filed suit; (2) arguments in paragraph 7 that the pledge of the utility system revenues is primary, rather than secondary or subordinate; (3) arguments in paragraph 8 that the ordinance violates promises made on the Lafayette Utility System website; (4) arguments in paragraph 10 that the ordinance is "in irreconcilable conflict" with the bond proposition regarding the pledge of "revenues," as opposed to "residual revenues"; (5) arguments in paragraph 13 that the ordinance violated the "single enterprise fund" requirement of the Fair Competition Act; and (6) arguments in paragraph 14 that the ordinance illegally attempts to establish a "payment-in-lieu-of-taxes" scheme.

None of these arguments are made in briefs by the plaintiffs.